UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUN WANG,

                    Plaintiff,

            v.

GIORGIO ARMANI CORPORATION,

                    Defendant.

ECF CASE

No.: _____

COMPLAINT

JURY TRIAL DEMANDED

## NATURE OF THE ACTION

1.      This action arises from Defendant's cruel and unlawful treatment of a hardworking and dedicated employee who dared to speak out about unlawful discrimination. During her employment, Plaintiff's co-worker, Andreus Munson, subjected her and her co-workers to numerous bigoted and derogatory comments, including: sexualizing clients by stating he wants to "put his kids" inside them, sexualizing Chinese people with sexual innuendos, stating "Chinese people are dirty," stating "I hate cheap Indians," insinuating that Chinese clients wouldn't buy anything because of their race, calling Plaintiff and other women "bitches," and using the word "Nigga" frequently and openly in the workplace.

2.      Worst yet, Plaintiff was subjected to an egregious instance of sexual harassment when this same co-worker who subjected Plaintiff and her peers to a discriminatory hostile work environment took a non-consensual picture of Plaintiff's backside.

3.      After she was victimized, Plaintiff did what every employee is told to do—she reported it in good faith, trusting that her employer would protect her. Instead, Defendant retaliated against her by fabricating pretextual accusations to discredit and silence Plaintiff for opposing sexual harassment in the workplace. Due to Defendant's unlawful discrimination and retaliation, Plaintiff has suffered severe emotional distress, including depression, anxiety, and suicidal

ideation so extreme that she contacted suicide hotlines on numerous occasions to seek the help and support Defendant refused to offer.

4.      As such, Plaintiff brings this action alleging that the Defendant has violated the 42 U.S.C. §1981 ("§1981"), Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq. ("ADA"), Title VII of the Civil Rights Act of 1964, § 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL") and seeks damages to redress the injuries she has suffered as a result of being discriminated against, sexually harassed, subjected to a hostile work environment, on the basis of her sex/gender, race, and disability, and retaliated against for her engagement in one or more protected activities.

## JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

5.      Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331 and 1343 as this action arises under 42 U.S.C. § 2000e, et seq.

6.      The Court has supplemental jurisdiction over the claims that Plaintiff has brought under State and City law pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as Defendant resides within the Southern District of New York, or the acts complained of occurred therein.

8.       Plaintiff will be filing these claims in a Charge with the Equal Employment Opportunity Commission and will amend this Complaint once she is issued a Right to Sue Letter related to her ADA and Title VII claims.

## PARTIES

9.      At all relevant times, Plaintiff is a resident of New York County, New York.

10.      Plaintiff identifies as female and Asian and was born in China.

11.     At all relevant times, Plaintiff was and is diagnosed with Post Traumatic Stress Disorder ("PTSD") and Generalized Anxiety Disorder ("GAD").

12.     At all relevant times, Plaintiff was disabled within the meaning of the ADA, the impairment of which substantially limits major life activities within the meaning of § 12102(1)(A) of the ADA, including sleeping, concentrating, working, thinking, and speaking.

13.     At all relevant times, Plaintiff was and is a qualified individual who can perform the essential functions of her employment with or without reasonable accommodation as defined by § 12111(8) of the ADA.

14.     At all relevant times, Plaintiff's diagnosis was a physical, mental, or medical impairment preventing the exercise of a normal bodily function within the meaning of NYSHRL § 292(21).

15.     As such, at all relevant times Plaintiff has and/or had a disability under the NYSHRL.

16.     At all relevant times, Plaintiff's diagnosis was a physical, mental, or medical impairment preventing the exercise of a normal bodily function with the meaning of NYCHRL § 8-107(1)(a).

17.     As such, at all relevant times Plaintiff has and/or had a disability under the NYCHRL.

18.     At all relevant times, Defendant Giorgio Armani Corporation ("Defendant" or "Defendant Giorgio Armani") was and is a domestic business corporation, existing pursuant to, and by virtue of, the laws of the State of New York.

19.     At all relevant times, Defendant maintained its principal place of business at 335 Madison Avenue, Floor 28, New York, New York 10017.

20.     At all relevant times, Defendant was Plaintiff's employer as defined by the applicable statutes.

21.     At all relevant times, Defendant employed 15 or more employees.

<u>MATERIAL FACTS</u>

22.     In or around March 2025, Plaintiff commenced her employment with Defendant as a Sales Supervisor, earning approximately $70,000 per year with base and commission.

23.     As Sales Supervisor, Plaintiff's primary responsibilities included managing employees, making personnel and operational decisions, opening and closing the store.

24.     Additionally, Plaintiff's primary worksite was the Emporio Armani brick and mortar store, located at 134 Spring Street, New York, New York 10012 ("the Soho Location").

25.     At all relevant times, Plaintiff was supervised by Store Director Niccolo Colzi.

26.     As Plaintiff's Manager and Supervisor, Store Director Colzi had the power to hire, fire, discipline, or otherwise affect the terms and conditions of Plaintiff's employment.

27.     Throughout her employment, Plaintiff was and continues to be a high performing Sales Supervisor, effectively managing her store location and resources to enhance the customer experience and improve Defendant's profitability.

28.     Plaintiff also assists in the management of the Soho Location's employees, including Andreus Munson.

29.     Upon information and belief, Munson identifies as black.

<u>Munson Subjects Plaintiff and his Co-workers to a Racial Hostile Work Environment[1]</u>

30.     From the outset of Plaintiff's employment, Munson spoke to Plaintiff and her co-workers in a manner that readily created a hostile work environment.

---

[1] The within section headers are for organizational purposes only.

31.    By way of example, early in Plaintiff's employment, Munson received a call from an Indian client. When he hung up the call, he stated to Plaintiff and their colleagues "I hate cheap Indian clients."

32.    Other examples of Munson's racially discriminatory behavior included complaining about Plaintiff's Chinese clients who did not speak English or inferring that certain individuals were not going to buy anything because of their race.

33.    On other occasions, Munson would talk about his personal life and partner, stating, in sum and substance "no offense, but Chinese people are dirty. Their house was filthy," referring to his visit to his Chinese partner's home.

34.    Further tokenizing his Chinese partner's background, on one specific occasion, Munson showed Plaintiff a Thai restaurant he wanted to bring his partner to, stating "I'm going to have Thai with a Chinese, then I'm going to have Chinese after."

35.    Munson also made frequent use of profanity and slurs in the workplace, using the N-word, "nigga," with other store employees – including to describe former Assistant Store Manager Phillip Thomas –  or saying "fuck" in front of customers.

36.    Munson's discriminatory comments in the workplace were frequent, occurring multiple times a week and being made in the presence of managers, including Store Director Colzi.

37.    Acting with complete impunity and facing no consequences to his blatantly discriminatory remarks in the workplace, Munson soon escalated his unlawful conduct that of a more violating and invidious nature.

Munson Subjects Plaintiff to Overt and Targeted Sexual Harassment

38.    On or about September 14, 2025, while in the employee break room of the Soho Location, Plaintiff heard Munson's camera shutter sound off towards her and take a picture of her backside without her consent.

39.    Plaintiff confronted Munson about the picture, asking why he took a photo of her. Munson responded that it was an accident.

40.    Plaintiff knew that Munson was being untruthful, as she clearly saw a thumbnail of a full body photo of her backside in which she was the sole and focused subject of the photo.

41.    As a result of Munson's sexually harassing conduct, Plaintiff felt shocked, violated, and unsafe.

42.    Plaintiff texted Store Director Colzi, reporting the sexually harassing incident in which Munson took a picture of her backside on purpose and that she "[did not] feel comfortable working here when it's like this."

43.    Store Director Colzi did not respond to Plaintiff's text complaint of Munson's sexually harassing behavior.

44.    The following day, Store Director Colzi pulled Plaintiff into his office and began to chastise her for texting him on his day off.

45.    When Plaintiff explained that she texted him because she felt harassed, Store Director Colzi responded in a dismissive and hostile manner, minimizing her complaints of sexual harassment as "accidental" without even performing an investigation.

Defendant Subjects Plaintiff to a Retaliatory Hostile Work Environment

46.    On or about September 18, 2025, while Plaintiff assisted a client during an active sale, Munson approached Plaintiff in an aggressive and intimidating manner and, in front of

customers and staff, falsely accusing Plaintiff of texting Store Director Colzi about Munson's client.

47.    Munson further stated that it was "embarrassing" – despite his accusation being untrue.

48.    Plaintiff attempted to remove herself from the situation, instructing Munson to leave her alone; however, as Plaintiff walked away, Munson began to mock her.

49.    This confrontation occurred publicly and appeared to be a deliberate attempt to humiliate and intimidate Plaintiff. As a result of this incident, Plaintiff became physically ill and vomited due to extreme stress and emotional distress.

50.    Later that day, Plaintiff attempted to text Store Director Colzi screenshots of her co-worker's group chat to report further harassing behavior; however, Plaintiff accidently sent these screenshots to her work group chat as a result of her stress and anxiety.

51.    When she realized her mistake, Plaintiff tried to unsend her message and subsequently sent her complaint to Store Director Colzi as initially intended.

52.    As a result of Munson's physically intimidating and threatening actions, Plaintiff decided to further escalate her complaints.

<u>Plaintiff Escalates Her Complaints of Sexual Harassment</u>

53.    On or about September 18, 2025, Plaintiff emailed Store Director Colzi and Senior Director Fabiola Velarde to ensure that her complaints of harassment against Munson were memorialized in writing.

54.    In her email, Plaintiff indicated that the emotional distress resulting from Munson's sexual harassment began to substantially impact her mental health and ability to work.

55.    Indeed, this emotional distress was worsened by Munson's retaliatory conduct, such as accosting Plaintiff in a physically aggressive manner and in the presence of customers.

56.    Plaintiff's apprehension and fear of Munson was worsened by the fact that Munson had criminal charges pending against him for assault.

57.    Upon information and belief, Defendant was aware of Munson's criminal charges and that he is a known safety risk to his co-workers and others around him.

58.    On or about September 19, 2025, Plaintiff emailed HR Manager Michelle Henriquez and Vice President of Human Resources Erica Abduelal, to similarly report sexual harassment. At that time, Plaintiff provided Aiko Shimbo as a witness.

59.    Later that day, Plaintiff met with HR Manager Henriquez and VP Abduelal via Zoom to discuss her complaints.

60.    During this meeting, Plaintiff expressed her concerns regarding feeling unsafe due to Munson's sexually harassing and retaliatory behavior, stating that she felt targeted as a woman and just wanted to feel safe at work.

61.    After Plaintiff explained the extent of Munson's harassing behavior, VP Abduelal assured her that Defendant would explore a schedule accommodation to prevent Plaintiff from working with Munson going forward.

62.    On or about September 22, 2025, Plaintiff sent a follow up email to HR Manager Henriquez and VP Abduelal, to further explain the September 14 and September 18 incidents with Munson.

63.    In this communication, Plaintiff described the September 18, 2025, incident in which Munson aggressively confronted Plaintiff, stating she felt "targeted and unsafe."

64.     Despite Plaintiff going through the proper channels and doing exactly what was expected of her, Defendant soon began to punish her for speaking up about unlawful sexual harassment and retaliation.

Defendant Retaliates Against Plaintiff and Fails to Accommodate Her

65.     On or about September 22, 2025, Store Director Colzi and Munson went to lunch together.

66.     Notably, this lunch occurred immediately after HR arrived in person at the Soho Location to begin investigating Plaintiff's complaints of sexual harassment.

67.     Upon information and belief, Munson returned from this lunch and told other store employees that Store Director Colzi was unhappy regarding HR's involvement in Plaintiff's complaint and that he told Munson ""nothing will happen" because of Plaintiff's complaint of sexual harassment.

68.     Munson further bragged that instead of interviewing Plaintiff's witness, HR only interviewed one witness regarding Plaintiff's complaint, who was Munson's friend.

69.     The following day, Plaintiff received an email from VP Abduelal indicating that the investigation into Plaintiff's complaints was almost complete, but that Plaintiff should return to work in the meantime.

70.     When Plaintiff returned to work, she realized that Defendant continued to schedule Plaintiff to work with Munson over the next week – despite express assurances that she would not have to work with her harasser again.

71.     On or about September 30, 2025, HR Manager Henriquez visited the Soho Location to discuss with Plaintiff the outcome of HR's investigation into her complaints of sexual harassment.

72.     Instead of supporting Plaintiff, who was the victim, Henriquez prioritized protecting Plaintiff's harasser by making retaliatory and pretextual statements regarding Plaintiff and her employment.

73.     Specifically, HR Manager Henriquez told Plaintiff that she had to "remain professional," suggesting that Plaintiff "raised her voice" in front of co-workers and customers.

74.     Moreover, Henriquez told Plaintiff that she cannot discuss the photo incident with her co-workers, despite Munson openly doing so in a repeated effort to undermine and intimidate her.

75.     Plaintiff calmly explained that these accusations were false, and that while Munson claims the photo of Plaintiff's backside he took was "deleted," there was no evidence to support that conclusion.

76.     Despite Plaintiff's genuine concerns, HR Manager Henriquez continued minimizing the sexual harassment she experienced, stating that the photo was "deleted," and that even if it wasn't, it was still an "accident."

77.     Indeed, upon information and belief, while HR Manager Henriquez repeatedly told Plaintiff that the September 14, 2025, incident was "an accident," HR told Munson that the incident constituted harassment "regardless of whether the photo was accidental or deleted."

78.     The contrast in treatment between Plaintiff and her peers directly demonstrates Defendant's discriminatory and retaliatory motives, as Defendant knowingly minimized the incident when speaking to Plaintiff while privately acknowledging its severity to others.

79.     Recognizing that Defendant was unwilling to help, Plaintiff renewed her request to be scheduled to work separately from Munson; however, Defendant made no concrete assurances that they would accommodate Plaintiff.

80.    After their conversation, HR Manager Henriquez handed Plaintiff a letter from VP Abduelal regarding the outcome of Defendant's investigation.

81.    When Plaintiff opened it, she saw that VP Abduelal spent most of the letter criticizing Plaintiff, telling her to maintain "appropriate forum and manner" and to avoid giving customers "the impression that we don't prioritize client experience."

82.    Plaintiff was shocked and deeply upset, as VP Abduelal's letter was further confirmation that Defendant prioritized protecting perpetrators of sexual harassment rather than the victims.

83.    On or about October 6, 2025, Store Director Colzi once again brought Plaintiff into his office and began to accuse her of stating "I don't give a fuck about my job" while at work.

84.    Plaintiff forcefully denied this accusation and requested evidence or the opportunity to speak to the employees making the claim; however, Store Director Colzi refused to provide this information.

85.    Plaintiff further confronted Store Director Colzi regarding his comment to Munson that "nothing will happen" with respect to Plaintiff's complaint of sexual harassment. When she did so, Colzi became silent and refused to acknowledge whether he said it.

Defendant's Retaliatory Conduct Escalates

86.    In or around early October 2025, Plaintiff noticed that Defendant posted her position on LinkedIn, seeking prospective candidates to fill her role. Plaintiff asked Store Director Colzi about the posting, however Colzi maintained that it was a "mistake."

87.    The following week, however, Sabrina Chaity was "temporarily" promoted to Plaintiff's position, Sales Supervisor.

88.     Plaintiff perceived this move to be part of the process to replace Plaintiff, wherein Defendant began the process of training Plaintiff's replacement, Sales Supervisor Chaity.

89.     Then, on or about October 8, 2025, HR Representative Henriquez visited Plaintiff's store to collect information intended to be used as pretext to fire Plaintiff.

90.     That same day, Store Director Colzi and Plaintiff's co-worker, Abdullah Masum went to lunch. When they came back, Masum stated to Shimbo, in sum and substance, that "the staff may be changing."

91.     On or about October 10, 2025, Plaintiff again approached Store Director Colzi and renewed her health-related accommodation request for a schedule modification to limit interactions with Munson because she felt unsafe working with her harasser.

92.     In response to her request for a reasonable accommodation, Store Director Colzi stated, "that's not possible" and "I don't want to hear it," thereby refusing to engage in the interactive process or cooperative dialogue.

93.     Despite knowledge of Munson's proclivity towards violence and his intimidating and threatening confrontations with Plaintiff, Defendant repeatedly refused to protect Plaintiff.

94.     That same day, Shimbo informed Plaintiff that HR "interrogated" her regarding whether Plaintiff used profanity in the workplace.

95.     Despite HR's inquisitorial tactics, Shimbo defended Plaintiff and replied that staff members other than Plaintiff use profanity regularly. Furthermore, Shimbo stated to Plaintiff that she believed HR was "trying to fire [Plaintiff]."

96.     On or about October 23, 2025, HR Manager Henriquez and Store Director Colzi called Plaintiff into a meeting without prior notice.

97.     HR Manager Henriquez began the meeting by stating that she expected Plaintiff to be "honest." HR Manager Henriquez then became hostile towards Plaintiff, asking if she said, "I don't give a fuck about my job."

98.     When Plaintiff realized that the meeting was an ambush, she requested permission to record the meeting; however, HR Manager Henriquez told Plaintiff that the meeting was already being recorded and that she would receive a transcript after.

99.     While Plaintiff repeatedly denied HR's accusation that she stated she didn't "give a fuck about [her] job," HR Manager Henriquez continued to pressure Plaintiff to falsely admit that she engaged in misconduct.

100.    When applying pressure to elicit a false admission did not work, HR Manager Henriquez stated that camera footage at the Soho location showed Plaintiff's employees supposedly "idle" for 40 minutes and that Plaintiff was to blame.

101.    Plaintiff responded that she had previously raised staffing issues to Store Director Colzi on multiple occasions, however, Colzi would ignore Plaintiff's complaints or become defensive.

102.    For the rest of the meeting, HR Manager Henriquez made defamatory accusations while talking over and interrupting Plaintiff, which Plaintiff explicitly told HR Manager Henriquez made her feel targeted as a non-native English speaker.

103.    Accordingly, Plaintiff requested a copy of the meeting transcript to preserve a record of what happened; however, HR Manager Henriquez refused to give it to Plaintiff.

104.    Later that day, Plaintiff emailed HR Manager Henriquez and VP Abduelal to formally request a copy of the transcript and any handwritten notes or summaries from their last meeting, as promised by HR Manager Henriquez.

105.    The following day, HR Manager Henriquez replied to Plaintiff's email acknowledging her request, stating that she would review it internally.

106.    Despite Plaintiff's repeated requests for the meeting transcript, Defendant refused to provide it for her, insisting that Plaintiff attend an in-person meeting to review it with them.

107.    As a result of Defendant's repeated retaliatory conduct towards Plaintiff, her mental health began to decline rapidly.

Plaintiff Experiences Exacerbation of her PTSD Symptoms Due to Defendant's Unlawful Conduct

108.    In or around early October 2025, Plaintiff began to experience a recurrence and extreme escalation in her PTSD related symptoms due to the sexual harassment and retaliation she experienced at work, including suicidal ideation, sleeplessness, feelings of loss of self-worth, depression, and anxiety.

109.    Unable to cope with the fallout of Defendant's unlawful conduct, Plaintiff began to contact the national suicide hotline.

110.    On or about October 14, 2025, Plaintiff texted suicide hotline indicating that she was "really sad" and "suffering from how unfair [her] job can be."

111.    Plaintiff further informed the suicide hotline representative that the stress caused her to be unable to sleep and that it "really put the suicidal thoughts back to my head for the last couple of weeks."

112.    Plaintiff continued to text the suicide hotline on multiple occasions, including October 24, 2025, and October 29, 2025. On these occasions, Plaintiff exclusively discussed Munson's sexual harassment and HR's retaliatory response to her complaints, including Defendant's accusations that Plaintiff engaged in inappropriate conduct at work and dismissed her requests for accommodation.

113.    Plaintiff generally contacted suicide hotline late at night, as the stress and anxiety from Defendant's unlawful conduct manifested itself as insomnia – or the inability to sleep.

Plaintiff Formally Requests a Reasonable Accommodation

114.    On or about October 27, 2025, Plaintiff followed up with HR Manager Henriquez reiterating her request for the transcript and notes from her October 23, 2025, meeting.

115.    Plaintiff also informed HR Manager Henriquez and VP Abduelal that she required reasonable accommodations due to "ongoing health-related stress."

116.    In this email, Plaintiff attached her treating doctor's note indicating that "she is not able to work from 10/27/2025 through 11/02/2025."

117.    Plaintiff's doctor further indicated that "[Plaintiff] would benefit from reasonable accommodations related to meetings involving HR. English is not her native language, and the meetings can worsen anxiety and stress without adequate preparation. These accommodations include being given advance warnings of meetings as well as a written agenda of topics ahead of time."

118.    In response to her request, HR Manager Henriquez and VP Abduelal informed Plaintiff that the formal channel for an accommodation request would be to meet with Defendant's benefits department.

119.    Per HR's advice, Plaintiff submitted a letter from her treating physician to the Defendant's Benefits Department, stating that she required brief leave as an accommodation for mental health challenges, as well as accommodations to address her worsening anxiety and stress in the workplace.

120. On or about October 29, 2025, Plaintiff spoke to Benefits Supervisor Quiana Johnson regarding her requests for accommodation. During this conversation, Plaintiff stated that she may require a leave of absence due to health reasons.

121. Later that same day, Benefits Supervisor Johnson emailed Plaintiff the policies related to requests for a leave of absence, including how to initiate the request and determine eligibility for leave. Benefits supervisor Johnson then instructed Plaintiff to have her healthcare provider complete certain paperwork regarding her need for accommodation.

122. On or about November 4, 2025, Plaintiff sent Benefits Supervisor Johnson and Human Resources Director Cinzia Gagliano medical documentation regarding her need for accommodation, receipt of which Defendant acknowledged that day.

123. To date, Plaintiff continues to engage in the interactive process to secure a reasonable accommodation.

Defendant Continues to Retaliate Against Plaintiff

124. At the same time that Plaintiff sought a medically necessary reasonable accommodation, Defendant continued to subject Plaintiff to a hostile work environment and retaliation.

125. For example, Munson continued to use other derogatory terms openly at work, such as calling Plaintiff and other women "bitch" or "bitches," calling co-workers such as Phillips Thomas the N-word, calling customers "pussies," and calling Plaintiff's clients "sexy" – including stating he likes "Asian guys" and that he wants to "put [his] kids inside [the client]."

126. Plaintiff perceived Munson's comments regarding his affinity for Asian men to indicate he had a sexual preference for Asian individuals – such as Plaintiff herself.

127.    Moreover, while Defendant continuously accused Plaintiff of saying the word "fuck" at work, Munson was free from consequence in his use of disparaging, hateful, and outright repugnant language in the workplace.

128.    By way of further example, Store Director Colzi began to repeatedly schedule Plaintiff's off day for Saturday – which is the busiest day for sales and most lucrative opportunity for commissioned salespeople to earn money.

129.    As a Sales Supervisor, Plaintiff's earnings and performance are directly related to in-store sales during her shifts. Resultingly, less Saturday shifts have and will continue to have a negative impact on Plaintiff's ability to meet performance expectations.

130.    While Defendant consistently scheduled Plaintiff to work Saturday shifts before her protected complaints of discrimination and retaliation, it scheduled Plaintiff off for three consecutive Saturdays after she engaged in these protected activities.

131.    In addition to retaliatory schedule modifications that impacted Plaintiff's performance and earnings, Store Director Colzi continued to build pretext by falsely accusing Plaintiff of misconduct.

132.    On or about November 10, 2025, Store Manager Colzi approached Plaintiff during work hours for a "touch base" meeting, during which he continued to falsely state that Plaintiff's performance was inadequate, including lack of productivity, cell phone usage, and cleanliness of sales floors.

133.    Then, on or about November 13, 2025, Store Manager Colzi confronted Plaintiff again, this time to reprimand her for her attendance.

134.    Specifically, Store Manager Colzi told Plaintiff that he was "documenting" each time that she was allegedly arriving to work late and that it was becoming a "pattern."

135.    Plaintiff explained that her late arrivals on November 3, 2025, and November 11, 2025, were due to medical appointments related to psychiatric treatment, and her November 13, 2025, lateness resulted from stress-related physical symptoms. Plaintiff further offered to go to urgent care during her lunch break to provide a doctor's note.

136.    Instead of acknowledging Plaintiff's medical documentation, Store Director Colzi emphasized lateness as a disciplinary issue, claiming that the Benefits team never informed him of an accommodation request.

137.    Store Manager Colzi's continued hyper-surveillance of Plaintiff is a further example of the retaliatory hostile work environment resulting from Plaintiff's numerous protected activities.

138.    At present, Plaintiff is still employed by Defendant, where she continues to experience ongoing retaliation and harassment.

139.    Defendant subjected and continues to subject Plaintiff to unlawful discrimination and a hostile work environment on the basis of her sex/gender, race and disability.

140.    Defendant failed to engage in the interactive process or cooperative dialogue and further failed to provide Plaintiff with a reasonable accommodation for her disability.

141.    Defendant retaliated against Plaintiff for engaging in one or more protected activities.

142.    Defendant is liable for the discriminatory conduct of their employee agents Munson, Store Manager Colzi, HR Manager Henriquez, and VP Abduelal.

143.    Defendant knew or should have known that Plaintiff was discriminated and retaliated against and subjected to a hostile work environment on the basis of her sex/gender, race, and disability.

144.    Plaintiff has been unlawfully discriminated against, humiliated, degraded and belittled and as a result, suffered violation of her rights, emotional distress, loss of income/earnings, loss of salary, loss of benefits, special damages, legal fees/costs, loss of enjoyment of life, economic hardship, and emotional and physical pain and suffering.

145.    Defendant's conduct has been malicious and willful, outrageous, and conducted with full knowledge of the law.

146.    As such, Plaintiff demands punitive damages as against Defendant.

**FIRST CAUSE OF ACTION**
**DISCRIMINATION, HOSTILE WORK ENVIRONMENT**
**IN VIOLATION OF §1981**

147.    Plaintiff repeats and realleges each allegation of the proceeding paragraphs as if fully set forth herein.

148.    § 1981 states in relevant part:

(a) Statement of equal rights. All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

(b) (b) "Make and enforce contracts" defined. For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

149.    Defendant unlawfully discriminated against Plaintiff in the terms and conditions of her employment by subjecting her to disparate treatment and a hostile work environment on the basis of her race, in violation of the § 1981.

## SECOND CAUSE OF ACTION
## RETALIATION IN VIOLATION OF §1981

150.    Plaintiff repeats and realleges each allegation of the proceeding paragraphs as if fully set forth herein.

151.    § 1981 also prohibits employers from retaliating against their employees for the exercise of rights guaranteed hereunder or opposing unlawful conduct prohibited by this section.

152.    Defendant engaged in unlawful employment practices prohibited by § 1981 by discriminating against Plaintiff with respect to the terms, conditions, or privileges of her employment because of her opposition to Defendant's unlawful employment practices.

## THIRD CAUSE OF ACTION
## DISCRIMINATION, HOSTILE WORK ENVIRONMENT
## IN VIOLATION OF THE NYSHRL

153.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

154.    Executive Law § 296 provides that:

> It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

155.    Defendant engaged in an unlawful discriminatory conduct prohibited by the NYSHRL by discriminating against Plaintiff on the basis of her sex/gender, race, disability, and failing to accommodate her disability and/or engage in the cooperative dialogue.

## FOURTH CAUSE OF ACTION
### RETALIATION IN VIOLATION OF NYSHRL

156.    Plaintiff repeats and realleges each allegation of the proceeding paragraphs as if fully set forth herein.

157.    Executive Law § 296(7) provides that:

> "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

158.    Defendant engaged in an unlawful discriminatory practice prohibited by the NYSHRL by discriminating against Plaintiff with respect to the terms, conditions, or privileges of her employment because of her opposition to Defendant's unlawful employment practices and/or requests for a reasonable accommodation.

## FIFTH CAUSE OF ACTION
### DISCRIMINATION, HOSTILE WORK ENVIRONMENT
### IN VIOLATION OF THE NYCHRL

159.    Plaintiff repeats and realleges each allegation of the proceeding paragraphs as if fully set forth herein.

160.    The New York City Administrative Code § 8-107(1) provides that:

> "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, national origin, gender, disability, marital status, sexual orientation, or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."

161.    Defendant unlawfully discriminated against Plaintiff in the terms and conditions of her employment by discriminating against Plaintiff on the basis of her sex/gender, race, disability, and failing to accommodate her disability and/or engage in the cooperative dialogue.

SIXTH CAUSE OF ACTION<br>RETALIATION IN VIOLATION OF NYCHRL

162.    Plaintiff repeats and realleges each allegation of the proceeding paragraphs as if fully set forth herein.

163.    The New York City Administrative Code § 8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

164.    Defendant engaged in an unlawful discriminatory practice prohibited by the NYCHRL by discriminating against Plaintiff with respect to the terms, conditions, or privileges of her employment because of her opposition to Defendant's unlawful employment practices and/or requests for reasonable accommodation.

DEMAND FOR TRIAL BY JURY

165.    Plaintiff requests a jury trial on all issues to be tried.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a judgment against Defendant:

a.      Declaring that Defendant participated in unlawful employment practices prohibited by §1981, ADA, Title VII, the NYSHRL, and the NYCHRL, in that Defendant discriminated against Plaintiff on the basis of her sex/gender, race, and disability, and subjected her to a hostile work environment, and retaliated against her for engaging in one or more protected activities.

b.      Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendant's unlawful conduct, and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

c.      Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

d.      Awarding Plaintiff punitive damages;

e.      Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action;

f.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

Dated:  New York, New York
        December 10, 2025

LIPSKY LOWE LLP

 /s/ Douglas B. Lipsky
Douglas B. Lipsky
Blake L. Ferris
420 Lexington Avenue, Suite 1830
New York, New York 10170-1830
Tel: 212.392.4772
doug@lipskylowe.com
blake@lipskylowe.com
*Attorneys for Plaintiff*